**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                  )
SHELLEY LIRIANO,                      )
AMANDA PICHARDO-PEREZ,     )
MARQUITA GRIMES,                   )
individually and on behalf of            )
similarly situated individuals,          )
                                                  )
                    Plaintiffs               )  Civil Action No.: 22-cv-10348
                                                  )
v.                                                 )
                                                  )
TURK & QUIJANO, LLP and JEFFREY )
TURK,                                          )
                                                  )
                    Defendants.            )
_____

## CLASS ACTION COMPLAINT WITH JURY DEMAND

## INTRODUCTION

Plaintiffs Shelley Liriano, Amanda Pichardo-Perez, Marquita Grimes (collectively, "Plaintiffs") bring this Complaint on behalf of themselves and all other similarly situated individuals, against Turk & Quijano, LLP and Jeffrey Turk (collectively, "Defendants"). As debt collectors and counsel, Defendants filed and prosecuted non-payment eviction actions against Plaintiffs and at least 110 other low- and moderate-income residents of Georgetowne Homes in Hyde Park, Boston ("Georgetowne Homes" or "Georgetowne"), in the spring of 2021. Defendants filed and prosecuted these cases, not with the intention of evicting any residents, but as a means to "get the attention of residents who weren't responding" and to induce them to obtain rental assistance. Defendants' choice to file premature eviction cases without actually intending to evict Georgetowne residents prevented Plaintiffs and other tenants from avoiding

the credit harms, economic consequences, and emotional trauma associated with eviction.  To compound the problem, in connection with the eviction filings, Defendants published incorrect information that overstated the amounts that tenants, including Plaintiffs, owed.  Moreover, in approximately 25 of these eviction cases, Defendants also illegally named minor children, including Plaintiff Shelley Liriano's 13-year-old child.  Defendants' actions violated consumer protection law, constituted a misuse of legal process, and threatened the housing stability (and future housing prospects) of Georgetowne residents at a time when the COVID-19 pandemic was devastating the majority-minority community of Georgetowne Homes.

## JURISDICTION AND VENUE

1. Because of Plaintiffs' claims under the Fair Debt Collection Practices Act, the Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

2. Venue is proper pursuant to both 28 U.S.C. § 1391(b)(1) and (b)(2), respectively, because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in it.

## THE PARTIES

3. Plaintiffs Shelley Liriano, Amanda Pichardo-Perez, and Marquita Grimes are individuals who reside at Georgetowne Homes in Hyde Park, Massachusetts.

4. Defendant Turk & Quijano, LLP ("Turk and Quijano") is a Massachusetts Limited Liability Company with a principal place of business at 10 Forbes Rd., Suite 400W, Braintree, MA 02184.

5. Turk and Quijano is a law firm which, according to its website, "represents hundreds of commercial and residential landlords in all facets of their businesses, including lease drafting, fair housing, lease enforcement, non-payment and cause evictions, general guidance, and related civil litigation."

6. Defendant Jeffrey Turk ("Turk") is a founder and the managing partner of Turk and Quijano. According to Turk and Quijano's website, "Attorney Turk is widely recognized as a leading expert in landlord-tenant law, representing many of the country's largest commercial and residential landlords, as well as several housing authorities."

**FACTS**

A. BACKGROUND

7. Developed in the early 1970s, Georgetowne Homes is comprised of 967 apartments: 121 one-bedroom apartments, 800 two-bedroom apartments, and 46 three-bedroom apartments in 68 two- and three-story townhouse and walk-up buildings.

8. Beacon Communities LLC ("Beacon"), a private real estate firm, through its subsidiaries Georgetowne Homes One LLC and Georgetown Homes Two LLC (the "Subsidiaries"), has owned and managed Georgetowne Homes since, upon information and belief, 2013.

9. All of Georgetowne's 967 units are income-restricted, with, upon information and belief, the majority of units having subsidized tenancies through project-based Section 8 or similar programs.

10. Every Georgetowne resident, by virtue of their income-restricted tenancies, has to undergo yearly recertification to review their income and determine the amount of their contribution to the monthly rent payment.

11. The majority of Georegetowne residents, including those with project-based Section 8, have subsidized tenancies and their share of rent is tied to their incomes. As a result, they are very often subject to interim recertifications whenever their incomes change.

12. Georgetowne Homes is located in census tract 1304, where the overwhelming majority of residents are people of color. Within census tract 1304, 29% of residents are white, 36% are

Black, and 24% are Hispanic/Latinx.  Of renter-occupied households, 28% are white, 47% are Black, and about 27% are Hispanic/Latinx.

13. Defendants have represented Beacon and its Subsidiaries since at least 2014 and have filed hundreds of eviction cases on Beacon and the Subsidiaries' behalf.

14. As a result, Defendants have extensive knowledge about the makeup of Georgetowne's residents, including that they all have low- or moderate-incomes, are overwhelmingly people of color, and most, if not all, are likely to have been affected by the COVID-19 pandemic.  They also have experience with and extensive knowledge about the management policies and practices that Beacon applies at Georgetowne, including the temporary policies and practices that were in effect during the pandemic.

15. In light of unrelenting pandemic-related income loss that affected the entire economy, but which was particularly acute in communities of color, many Georgetowne tenants were eligible for lower rent shares (and higher subsidies) in light of legally mandated subsidy recertifications.

16. Defendants knew that Beacon was not processing these recertifications in an accurate or timely fashion during 2020 and early 2021.

17. By March 2021, a multitude of governmental programs providing financial aid for rental arrearages (often called "rental assistance") were available, including Residential Assistance for Families in Transition (RAFT), the Subsidized Housing Emergency Rental Assistance (SHERA) program, the Emergency Rental Assistance Program (ERAP), and the Emergency Rental and Mortgage Assistance (ERMA) program.  In sum, around $900 million in rental assistance was available in March 2021.

18. These programs could cover up to 12 months of rent arrears for tenants (or more when used in combination).

19. None of these programs required a pending eviction action. In other words, tenants were eligible for assistance through the programs based on having rental arrearages, rather than a pending court filing.

20. As long-time attorneys for Beacon and other landlords, Defendants were well aware of these programs, their eligibility guidelines, and that Georgetowne tenants who were behind on their rent would uniformly be eligible for rental assistance by virtue of their subsidized and/or income-restricted tenancies.

21. Nonetheless, Defendants filed at least 113 non-payment eviction cases against Georgetowne residents on Beacon's behalf in March 2021.

22. Pledges which Beacon made prior to the filings about avoiding evictions, as well and its averments months after the evictions were filed that it would not evict any Georgetowne Homes tenants, make clear that Defendants' intention in filing all the eviction actions was not to terminate tenancies and evict residents (the intended purpose of summary process proceedings). Instead, Defendants' aim was to coerce and intimidate tenants to make rental payments, regardless of amounts actually owed, and to pressure them to apply for rental assistance to facilitate third-party payment for such amounts (again regardless of actual amounts owed).

23. The fall before the filings, Beacon, signed two public pledges; one spearheaded by the City of Boston, and the other by the Baker administration.

24. In the first, which Beacon signed in October 2020, Beacon agreed that "in cases where a repayment plan is unrealistic, [it would] work with renters to secure government or philanthropic funded rental assistance" and that "whenever possible, [they would use] repayment plans and rental assistance resources … in lieu of legal eviction proceedings."

5

25. In or about early November, 2020, Beacon signed onto the Baker administration's pledge (the "Eviction Diversion Pledge") to use alternatives to avoid eviction.

26. On November 10, 2020, Beacon's CEO, Dara Kovel, was quoted in a joint press release concerning the Eviction Diversion Pledge. In it, she stated,

> As the owner of over 18,000 affordable and mixed-income homes, with 9,000 in the Commonwealth, we helped to develop this pledge to demonstrate **our commitment to keeping tenants stably housed** during this time of uncertainty and to encourage other owners across the state of Massachusetts to join us. Housing is a right – not a privilege – and stable, affordable housing is crucial to the health and well-being of our communities.

(emphasis added).

27. These public pledges demonstrate that, despite Beacon and Defendants' mass filing of eviction actions, they did not actually intend to evict any tenants, but instead to coerce and intimidate tenants to make rental payments and apply for rental assistance, regardless of amounts actually owed.

28. In a May 14, 2021, letter to local non-profit City Life/Vida Urbana, Beacon's CEO Dara Kovel averred that "[d]uring the pandemic, we will not evict any residents for nonpayment of rent. Beacon Communities signed the City's Housing Stability Pledge, is honoring that pledge, and is working with state officials to make it easier for residents to access financial assistance."

29. In addition, Sheila Dillon, Chief of Housing and Director of Neighborhood Development for the City of Boston, recounted in a June 21, 2021 Boston Globe article that Beacon "told [the city] their motivation [in filing suit] was to get the attention of residents who weren't responding."

30. Defendants thus filed and prosecuted these lawsuits as a means to secure rental assistance and other payments, without any intention of securing eviction judgments.

31. Not only did Defendants abuse process on behalf of their client, but they also misstated amounts due and illegally named minor children in their filings.

6

32. Each lawsuit not only alleged that the tenants occupied the premises unlawfully but also that the tenants owed a certain amount of past due rent.

33. Defendants had access to tenant records from which they knew or could have readily determined that the amounts claimed due from tenants were higher than the amount they actually owed.

34. Defendants also illegally named minor children in at least 25 of these summary process cases.

35. Among the children whom Defendant named was Ms. Liriano's 13-year-old child.

36. The children were not leaseholders, and it is also expressly against Massachusetts law to name a minor child in a summary process case.

37. Defendants had access to tenant records from which they knew or could have readily determined the minor children's ages and that they were not—nor could they have been—leaseholders.

38. Defendants' filing and prosecuting of these unnecessary and error-riddled evictions forced tenants to use their time and effort to prepare for and attend unnecessary court proceedings, caused unnecessary emotional distress, and also created a difficult, if not impossible, to remove negative marker on the affected tenants' housing and credit histories.

39. Studies show that tenants who have experienced the mere threat of an eviction, even without displacement, are more likely than tenants who do not face housing instability to report health conditions correlated with higher morbidity and poorer overall health, including high blood pressure, depression, anxiety, and psychological distress.

40. The COVID-19 pandemic has only exacerbated the stress resulting from threats of eviction, as many tenants are acutely aware that eviction increases the likelihood of contracting a potentially deadly virus.

41. In addition, the mere filing of an eviction case can greatly affect tenants' ability to find future housing.

42. Each tenant now has a record on MassCourts, the online docket for state cases in Massachusetts.

43. A MassCourts record against an adult cannot be removed or expunged under current law.

44. A variety of tenant screening companies collect eviction records from MassCourts or from other sources which provide access to public records. The mere filing of an eviction case will thus typically show up on tenant screening companies' reports.

45. In addition, tenant screening companies often use algorithms that result in a recommendation to reject applications of prospective tenants who have a prior eviction filing on their record.

46. Many landlords rely on MassCourts records and/or tenant screening companies to determine whether they will offer a rental unit to an applicant.

### B. Named Plaintiffs

**Shelley Liriano**

47. Shelley Liriano is 32 years old and has lived at Georgetowne Homes since 2010.

48. Ms. Liriano's three minor daughters reside with her.

49. Ms. Liriano has project-based Section 8 assistance and her rent share is based on her income.

50. In 2020, Ms. Liriano was working as a birth registrar at Beth Israel Deaconess Medical Center.

51. In December 2020, she was exposed to COVID and took leave from work because of this exposure and also because she was pregnant with her youngest child.

52. For a period of time, Ms. Liriano had no income as she waited for her Family Medical Leave Act ("FMLA") request to be processed. Even after her FMLA request was approved in March 2021, Ms. Liriano's income was lower than it had been prior to her leave.

53. Thus, from mid-December 2020 to mid-April 2021, when she started a new job as a unit coordinator at Newton-Wellesley Hospital, Ms. Liriano had limited or no income.

54. As early as December 23, 2020, Ms. Liriano repeatedly tried to inform Beacon management that her income had decreased and thus her share of the rent should be lower. She was passed along a chain of employees all of whom informed her that they were not the correct person to assist her.

55. Ms. Liriano kept paying what she believed was the correct share of rent based on what her income was at any given time.

56. Despite Ms. Liriano's continued payment of her rent share and her many attempts at recertification, Beacon sent her a Notice to Quit in late January 2021.

57. Despite the fact Ms. Liriano had this long-pending recertification request, Defendants filed a case against her in Eastern Housing Court on March 15, 2021, demanding possession and $2,119.63 in rent.

58. Defendants demanded rent and possession not only from Ms. Liriano, but also from her 13-year-old minor daughter.

59. Ms. Liriano's minor daughter is not a leaseholder and thus could not have owed a debt to Beacon.

60. Nonetheless, Ms. Liriano's daughter remained a part of the case for two months, until Defendants, on Beacon's behalf moved to dismiss the case against her and expunge her from the Court docket.

61. However, Defendants did not move to seal the relevant documents and, as of March 1, 2022, there remained public documents with Ms. Liriano's daughter's name on them.

62. With pressure from Defendants and despite the fact that she did not believe she owed Beacon anything, Ms. Liriano applied for rental assistance from the SHERA program in April 2021.

63. Only after Ms. Liriano was approved for $1,370 in rental assistance from the RAFT program in June 2021 did Defendants dismiss the case against her.

64. By this time, Ms. Liriano had expended hours of her time on the case and going to court.

65. Ms. Liriano's recertification from July 2020 was finally completed by Beacon in December 2021.  Her recertification makes clear that she owed nothing at the time Defendants filed the case against her or at either time she was pressured to fill out rental assistance applications.

66. In fact, she was credited over $5,500 due to the retroactive adjustment of her rent share.

67. Defending the wrongful court action and facing eviction was extremely emotionally taxing for Ms. Liriano, particularly because she was aware that she was not behind on rent.

68. Ms. Liriano had constant anxiety about becoming homeless at a time when she was already undergoing post-partum depression.

69. She had trouble eating, sleeping, and found herself getting distracted at both at work and at home when she was trying to parent her children.

70. She also worried about the effect an eviction record might have on future credit options for both herself and her daughter.  She wants her daughter to have good credit for the future and worried (and continues to worry) about what it will mean to have an eviction case reflected on her credit.

**Amanda Pichardo-Perez**

71. Amanda Pichardo-Perez is 27 years old and has lived at Georgetowne Homes since 2018.

72. She has a project-based Section 8 subsidy.

73. She is a full-time nursing student and a single mother of a six-year-old, and also works part-time at Newton-Wellesley Hospital as a personal care attendant.

74. Ms. Pichardo-Perez had to quit her job as a home health aide during the pandemic because the Boston Public Schools shut down and she did not have any childcare.

75. She was out of work for six months of 2020 as a result.

76. As soon as she stopped working, Ms. Pichardo-Perez tried calling to let Beacon management know so they could adjust her rent share to zero. When she was unable to reach anyone by phone, she emailed to let management know. Nonetheless, no steps were taken in 2020 to recertify her income and adjust her share of the rent.

77. Ms. Pichardo-Perez received a Notice to Quit from Beacon in late January 2021, stating that she owed a total of $2,161.00 for the months March 2020 through November 2020, precisely the time she was out of work.

78. Despite the fact that Ms. Pichardo-Perez believed that she owed no money because her rent share should have been nothing for these months, she was distressed by the Notice to Quit, and thus filled out a packet to request rental assistance and placed it in the rent box at Beacon's office.

79. Nonetheless, Defendants, on Beacon's behalf, filed an eviction action against Ms. Pichardo-Perez on March 15, 2021, seeking both possession of her unit and $2,160.88 in rent.

80. While the Summons and Complaint stated that she owed $2,160.88, the account annexed to it stated that she owed a different amount—$2,067.

81. The account annexed to the Summons and Complaint was also inconsistent with the Notice to Quit. The former stated that she owed rent for February 2019 through March 2021, whereas the Notice to Quit only alleged she owed rent for March 2020 through November 2020.

82. From the time of the first proceeding in her summary process action, Defendants acknowledged that the amount claimed due was wrong and that Beacon did not know the amount she legitimately owed as of April, 2021.

83. Nevertheless, Defendants did not agree to dismiss the summary process case for six additional weeks, necessitating a second court appearance by Ms. Pichardo-Perez and her counsel.

84. Defendants ultimately dismissed the case against Ms. Pichardo-Perez on June 22, 2021, after she received RAFT, a form of rental assistance.

85. However, Ms. Pichardo-Perez would not have owed any money to Beacon had Beacon properly adjusted her income and credited all of her payments.

86. Ms. Pichardo-Perez's 2020 recertification was not completed until late 2021, despite the fact that she had given Beacon notice of her change in income in spring 2020.

87. The eviction case caused Ms. Pichardo-Perez severe emotional distress. She had never faced the prospect of eviction before, and became extremely anxious. She had trouble sleeping and concentrating and became extremely worried about the prospect of homelessness and how it would affect her and her child.

88. She also failed a semester of nursing school at Labouré College in 2021 because she was having so much trouble concentrating. A semester of nursing school costs her approximately $11,000.

89. Ms. Pichardo-Perez also now has a record on Masscourts of the eviction proceedings.

**Marquita Grimes**

90. Marquita Grimes has lived at Georgetowne Homes since 2011. She is 38 years old and lives alone.

91. Ms. Grimes has income-restricted housing through a program called "Below Market Interest Rate."

92. Every year, Ms. Grimes must recertify her income and family composition to confirm her eligibility for this program.

93. In 2020 and 2021, Ms. Grimes's monthly rent was about $1,083 a month.

94. Ms. Grimes works as a materials management specialist and Operating Room attendant at Beth Israel Deaconess Medical Center.

95. While her work did not change during the pandemic because she is considered an essential employee, the chaos of the pandemic did increase her regular expenses.

96. For example, for safety purposes, Ms. Grimes started taking Ubers to and from work instead of the MBTA.

97. Because the Ubers were expensive, Ms. Grimes bought a car in November 2020. The down payment cost her approximately $3,000 and she had new monthly car and insurance payments.

98. Around the time she bought her car, and due to these much-increased transportation costs, Ms. Grimes got behind on her rent.

99. Ms. Grimes received a Notice to Quit in late January, 2021. The Notice to Quit alleged she owed a total of $1,766.00.

100. Not knowing about the availability of rental assistance, and desperately wanting to avoid becoming homeless, Ms. Grimes took out a loan. She did so because she was fearful that Beacon would evict her and even though she was eligible to receive rental assistance to cover the amount of the arrears.

101. She paid off the rental arrears in full by March 11, 2021.

102. Ms. Grimes attempted to get in touch with Defendants multiple times after March 11, 2021 to inform them that she had paid off the debt in full. She called Turk and Quianjo and talked to a receptionist on more than one occasion, but was not able to get through to any attorney, including Attorney Turk.

103. Even though Ms. Grimes did not owe anything and had paid off her arrearage in full, Defendants still filed an eviction action against her on March 15, 2021.

104. Moreover, Defendants did not dismiss the wrongfully-filed case against her until six weeks later, on April 30, 2021.

105. In addition, prior to dismissal, on April 27, 2021, with full knowledge and acknowledgement that Ms. Grimes had long ago cured any default, Defendants coerced her into signing an Agreement for Judgment form (the "Agreement for Judgment").

106. The Agreement for Judgment dictated that judgment for Beacon would enter for possession of the premises and court costs of $210.

107. Defendants coerced Ms. Grimes into signing this Agreement for Judgment knowing that she was current on rent and that Beacon had no basis for filing any eviction case against her or any right to possession of the unit.

108. Defendants would have filed the Agreement for Judgment were it not for the intervention of a lawyer from Greater Boston Legal Services, whom Ms. Grimes consulted.

109. The entire lawsuit greatly affected Ms. Grimes' emotional well-being. She was extremely upset to be sued despite the fact she had paid off her debt and even more irate that she was almost tricked into paying court costs for an improperly filed case.

110. Ms. Grimes was extremely anxious throughout the court case; she was worried about going to court and about being evicted and forced to find new housing.

111. There is also now a court record of the wrongfully filed case against Ms. Grimes on Masscourts.

### C. Class Allegations

112. Plaintiffs bring this action against Defendants on behalf of themselves and all others similarly situated (the "Class") as follows: Georgetowne tenants who were sued by Defendants on Beacon's behalf in non-payment actions in Eastern Housing Court between March 8, 2021 and December 31, 2021. Excluded are any persons who have released Defendants for the claims asserted.

113. Ms. Liriano brings this action against Defendants on behalf of the Class and also a subclass consisting of members of the Class who had a minor child named in their eviction action (the "Subclass").

114. All of the criteria for class certification under Fed. R. Civ. P. 23 are satisfied:

    a. The Class and Subclass are each so numerous that joinder of all members is impracticable. Within the relevant time periods Defendants filed at least 113 eviction actions against Georgetowne Homes residents. Upon information and belief, during the relevant time periods, Defendants named minor children in at least twenty-five cases.

    b. There are questions of law and fact common to the Class that predominate over any questions affecting only individual members of the Class. These common questions include but are not limited to whether Defendants are debt collectors under the FDCPA; whether the eviction actions and collection actions were filed for reasons other than to obtain possession of the premises; whether Defendants threatened action that was not intended to be taken; whether Defendants sought to collect amounts from Class members that they did not owe; whether Defendants' actions violated the FDCPA; and whether Class members are entitled to recover damages (and other appropriate relief) due to Defendants' violations of their rights. Common issues for the Subclass include but are not limited to whether naming a minor in an eviction complaint is illegal, unfair, and/or unconscionable. All of these issues are based on the same facts and legal theories for the Class and Subclass, respectively. The only individual issue is the specific relief to be awarded each Class and Subclass member,

   a matter that is capable of resolution through a ministerial review of Defendants' records.

  c. Plaintiffs' claims are typical of the Class members' claims in that they were sued by Defendants in Eastern Housing Court without intent to use such proceeding for their proper purpose and/or for amounts they did not owe. Plaintiff Liriano's claims are typical of the Subclass members' claims in that her minor child was named as a defendant in the eviction action filed against her.

  d. Plaintiffs will fairly and adequately represent the Class members' interests. All claims are based on the same fact pattern and legal theories and Plaintiffs' interests are consistent with the interests of the class. Moreover, Plaintiffs have retained counsel experienced in housing law, consumer protection law, consumer class actions and FDCPA litigation.

115. A class action is superior for the fair and efficient adjudication of the claims. Class members are generally unsophisticated individuals who are unaware of the protections provided by the FDCPA, and whose damages are not substantial enough to make individual litigation cost-effective. Therefore, most Class members' rights will not be vindicated in the absence of a class action. In addition, prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications resulting in the establishment of inconsistent or varying standards for the parties and would not be in the interest of judicial economy. Finally, there are no unusual or difficult case management issues inherent in this litigation.

## CLAIMS FOR RELIEF

### CAUSE OF ACTION: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")

116. Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein.

117. Ms. Grimes, Ms. Liriano, and Ms. Pichardo-Perez are "consumers" as defined by 15 U.S.C. § 1692a(3) because each is an individual and was alleged to owe a consumer debt.

118. Defendants are "debt collectors" under 15 U.S.C. § 1692a(6) because they regularly collect and attempt to collect, directly and indirectly, consumer debts due or owed or asserted to be due or owed another.

119. Defendants violated the following provisions of the FDCPA:

   a. 15 U.S.C. § 1692e(4), by threatening to seize property through eviction proceedings when they did not intend to force tenants to leave the premises;

   b. 15 U.S.C. § 1692(e)(2)(A), by misrepresenting the character, amount, or legal status of the tenants' purported debts;

   c. 15 U.S.C. § 1692e(5), by threatening to take actions they did not intend to take for the purposes of collecting a debt;

   d. 15 U.S.C. § 1692e, by falsely representing the amount of the Plaintiffs' purported debts and the intent to evict Plaintiffs; and

   e. 15 U.S.C. § 1692f, by using unfair and unconscionable means in connection with collections of debts.

120. As a direct and proximate result of Defendants' violations of the FDCPA, Plaintiffs have suffered damages, including but not limited to damage to their credit and emotional distress.

## REQUEST FOR A JURY TRIAL

Plaintiffs request trial by jury on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully request that this Honorable Court grant following relief:

1. Awarding Plaintiffs and the Class actual damages;

2. Awarding Plaintiffs and the Class statutory damages;

3. Awarding interest, costs, and reasonable attorney's fees; and

4. Awarding such further relief as shall be just and proper.

Dated: March 7, 2022

Respectfully submitted,
Plaintiffs

By their attorneys,

/s/ Alexa Rosenbloom
Alexa Rosenbloom, BBO #679108
Roger Bertling, BBO # 560246
Legal Services Center of Harvard Law School
(617) 522-3003
arosenbloom@law.harvard.edu
rbertlin@law.harvard.edu

/s/ Stuart Rossman
Stuart Rossman, BBO #430640
Charles Delbaum, BBO # 543225
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110-1245
(617) 542-8010
srossman@nclc.org
cdelbaum@nclc.org

/s/ Gary Klein
Gary Klein, BBO #560769
Greater Boston Legal Services
197 Friend St.
Boston, MA 02114
(617) 603-1543
GKlein@gbls.org